UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAWN MUTALEMWA, | ) | CASE NO. 5:13CV1745 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | **REPORT AND RECOMMENDATION** |
| ACTING COMMISSIONER OF | ) | **OF MAGISTRATE JUDGE** |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Dawn Mutalemwa ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  ECF Dkt. #1.  For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

I.    **PROCEDURAL AND FACTUAL HISTORY**

Plaintiff applied for DIB and SSI on April 7, 2010 and April 15, 2010 respectively, alleging disability since January 31, 2007.  Tr. at 10.  However, because a previous decision finding that Plaintiff was not disabled was entered on October 24, 2007, and was final and binding, the ALJ based his decision on a full review of the record from October 25, 2007 through the date of the decision.[2]  Plaintiff's date last insured is March 31, 2012. Tr. at 13. The SSA denied Plaintiff's

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]The ALJ acknowledged that the doctrine of *res judicata* announced in *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir.1997) did not apply in this case because new and additional evidence was available. The ALJ cited a Report of Contact dated October 22, 2010, which reads, in its entirety:

I have looked at the final findings of the ALJ decision dated 10/24/2007, and find that the

applications initially and on reconsideration. Tr. at 66-69.  Plaintiff requested an administrative hearing, and on February 15, 2012, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff and Gene Burkhammer, an impartial vocational expert ("VE"). Tr. at 28-65. On March 1, 2012, the ALJ issued a Decision denying benefits. Tr. at 10-21. Plaintiff appealed the Decision, and on June 10, 2013, the Appeals Council denied review.  Tr. at 1-5.

On August 9, 2013, Plaintiff filed the instant suit seeking review of the Decision.  ECF Dkt. #1. On January 3, 2014, with leave of Court, Plaintiff filed a brief on the merits.  ECF Dkt. #16. On February 3, 2014, Defendant filed a brief on the merits.  ECF Dkt. #17.  No reply brief was filed.

## II.  SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffered from degenerative disc disease of the cervical spine, fibromyalgia, urinary incontinence, bipolar disorder, borderline intellectual functioning and post-traumatic stress disorder ("PTSD"), which qualified as severe impairments under 20 C.F.R. §404.1520(c) and 416.920(c).  Tr. at 13. The ALJ characterized Plaintiff's sciatic pain, migraine headaches, gastritis, asthma, contact dermatitis, anxiety, alcohol abuse, and marijuana abuse as non-severs impairments. Tr. at 13-14. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526, 416.920(d), 416.925 and 416.926  ("Listings").  Tr. at 14-15.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), except that she cannot climb ladders, ropes, or scaffolds and can only occasionally climb ramps and stairs; she can occasionally stoop, kneel, crouch, and crawl;  she must have immediate access to restroom facilities (one of two times

---

new file does have new and material changes.  The ALJ/AC RFC/MRFC is not being adopted because limitations were given based on allegations of neck pain and RUE [right upper extremity] symptoms (without objective documentation of RUE radiculopathy). Currently, the claimant does not allege neck or RUE symptoms.  Current medical evidence does not document any neck pain.  The ALJ should not be adopted as new MER shows no current evidence of cervical DDD.

Tr. at 265.

a day for a total of no more than five to ten minutes); she can understand, remember, and carry out simple instructions and perform simple, repetitive tasks; she requires a relatively static low stress workplace with few and easily explainable changes in work settings or work processes and without strict production quotas or fast-paced high production demands; and she can have occasional superficial contact with the public and occasional interaction with a small group of coworkers. Tr. at 15.

The ALJ ultimately concluded that, although Plaintiff could not perform her past relevant work as a hand packager, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of housekeeping cleaner, food service worker, and laundry folder. Tr. at 21. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

**III.** **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**IV.**     **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

**V.**     **ANALYSIS**

Plaintiff advances three arguments in this appeal.  In her first and third arguments, Plaintiff contends that she meets or equals Listings 12.04, 12.05, 12.06.  Because Plaintiff's first and third arguments specifically challenge the ALJ's findings at Step Three, they shall be addressed out of

order.  In her second argument, Plaintiff contends that substantial evidence does not support the ALJ's findings with respect to her credibility, the opinions of the consultative examiners, and the physical limitations based upon her urinary incontinence.

### A.    Medical history

Between October 28, 2005 and May 29, 2007, Plaintiff received treatment for anxiety, depression, panic attacks, and a chaotic family environment at Community Services of Stark County. Tr. at 283. She also reported problems with reading and comprehension. Tr. at 288. Plaintiff was discharged for failing to appear for scheduled appointments. Tr. at 283. She was discharged with a diagnosis of PTSD and rule out bipolar disorder. She was assigned a Global Assessment of Functioning ("GAF") score of fifty-two.[3] The provider did indicate that Plaintiff had made some progress during treatment, that is, implementing coping skills to deal with her husband and gaining insight into "how to handle herself in matters." Tr. at  284.

On April 28, 2008, Plaintiff underwent an initial psychiatric evaluation at Coleman Professional Services. Tr. at 548. Plaintiff reported mood swings, depression, and anxiety, and was tearful throughout the appointment.  On mental status examination, Nalini Morris, D.O., noted Plaintiff was "cognitively limited," and also that her insight was limited, her mood depressed, and her affect constricted.  Tr. at 549. Dr. Morris diagnosed acute PTSD, bipolar disorder I, marijuana abuse, and history of alcohol abuse, and she assigned a GAF score of fifty to fifty-five.[4]  Tr. at 550.

---

[3]A GAF score is a numeric scale (1 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, *e.g.*, how well or adaptively one is meeting various problems-in-living.

A GAF score of fifty-one to sixty indicates moderate symptoms (*e.g.*, flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

The GAF is no longer included in the DSM-5. The new DSM-5 includes a WHODAS outline, which takes the place of the GAF scores.

[4]A GAF score of forty-one to fifty indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job, cannot work).

-5-

Plaintiff received mental health treatment at Coleman Professional from July 30, 2008 until January 1, 2012.  Tr. at 404-66; 551-601; 678-83; 690-730; 843-78. On July 30, 2008, Plaintiff reported that she had her own apartment and was doing much better.  Tr. at 551.  She was not taking her medication as prescribed for three months.  She described milder mood swings, which were manageable at the time, however, she acknowledged the fact that she must restart her medication to prevent her symptoms from resurfacing. Tr. at 551. She was pleasant and cooperative with clear speech and no lability of mood or affect. Tr. at 552. Plaintiff expressed her intention to return to school to study legal transcription in the event that her disability application was denied.

On August 21, 2008, Plaintiff reported that she was waiting for fall semester return to school and still had not restarted her medication.  Plaintiff's mood/affect was described as anxious and labile, and her speech pressured.  Tr. at 555.  On August 28, 2008, Plaintiff was observed to be sad and tearful. Tr. at 558. She stated that she could not afford to return to school and was "trying to find things to keep herself busy until she can get back into college in the Spring."  Tr. at 557.  On September 9, 2008, Plaintiff reported that she was working with the Bureau of Vocational Rehabilitation.  Tr. at 560.  She was taking her prescribed medication and reported a decrease in anxiety. The treatment notes also document a decrease in depression.  Tr. at 561.

On October 13, 2008, she was observed to be anxious and tearful. Tr. at 564. Her speech was pressured and her thought process was described as "racing." She reported that her live-in boyfriend had been jailed for a period of six months, and that she was staying at home everyday.  Tr. at 563. On October 23, 2008, Plaintiff was described as "more tearful and dysphoric." Tr. at 567.  She reported missing her boyfriend.

On November 13, 2008, Plaintiff presented to the Mercy Medical Center emergency department ("Mercy") complaining of anxiety. Tr. at 377. She was discharged with diagnoses of anxiety disorder and history of PTSD.  On November 16, 2008,  Plaintiff returned to Mercy after a neighbor had informed police that she was agitated, not sleeping, and hallucinating. Tr. at 366. Plaintiff was fearful and described a shadow that was following her.  A representative from the Crisis Center attempted to interview Plaintiff, but she refused to be admitted. Tr. at 365. Because

she was neither suicidal or homicidal, or overtly psychotic, she was discharged. Plaintiff returned to Mercy that same day after calling 911. Tr. at 375. She was given medication and discharged.

In the morning on November 18, 2008, Plaintiff presented to Mercy reporting anxiety. Tr. at 359. She indicated she had not been taking her psychiatric medication as directed. Over the course of the visit Plaintiff apparently improved, because she expressed feeling silly for calling an ambulance and coming to the hospital for this issue. Tr. at 357. However, Plaintiff returned to Mercy later that evening reporting anxiety and thoughts of hurting herself. Tr. at 350. She conceded that she had exhausted her supply of medication and that she kept seeing a "dark shadow figure" following her.  Plaintiff attempted to hang herself with a bed sheet while in the hospital. Tr. at 347. She was transferred to Heartland Behavioral Health.

On December 10, 2008, treatment notes from Coleman indicate Plaintiff was "more anxious than usual" after her hospitalization.  Tr. at 570. She had contact with the man who raped her.  He attempted to come to her apartment but she was able to stand up to him and "scared him away."  Tr. at 569.  She was anxious knowing that the man who raped her was still on the streets and hoped that he would be arrested. She did not recall her suicide attempt.  On December 14, 2008,Plaintiff presented to the Mercy reporting difficulty concentrating. Tr. at 332. She was diagnosed with bipolar disorder. On December 18, 2008, treatment notes from Coleman indicate that she was less anxious and depressed. Tr. at 573.  A male friend was living with her, which made her feel safe. Tr. at 572.

On February 19, 2009, Plaintiff reported that she was looking forward to her boyfriend's release from prison in two months and that she no longer worried about the man who raped her.  Tr. at 575.  Her PTSD was controlled and she was doing well on Abilify, although she had gained thirty pounds. Treatment notes document less depression and anxiety.  Tr. at 576.

On April 28, 2009, Plaintiff's medication was modified and treatment notes reflect that Plaintiff had lost some weight.  She reported getting along with her boyfriend.  On June 22, 2009, Plaintiff was depressed and tearful at times. Tr. at 582.  She reported getting no support from her boyfriend. On October 14, 2009, Plaintiff reported difficulty with her boyfriend and his friends, who smoked marijuana at all hours in her home.  She further reported that Buspar was helping with her

anxiety, but that she was still "panicky." Tr. at 584.  Despite her circumstances, treatment notes document a brighter affect and mood, and more positive and assertive thought content.  Tr. at 585.

On February 4, 2010 Plaintiff was agitated and crying. Tr. at 588.  She reported that her boyfriend belittled her and called her names.  Tr. at 587.  She stated that she did not want to leave him and be alone, because she feared that she might be raped again. Treatment notes reflect that Plaintiff was more angry than usual, but that her anger was appropriate to her current situation with her boyfriend.

On March 8, 2010, Plaintiff was seen at Coleman on an emergency basis due to her inability to tolerate Pristiq.  Tr. at 590.  She reported ongoing problems with her boyfriend and frustration with her multiple medical problems. Treatment notes reflect that Plaintiff was "crying profusely" and her judgment was poor due to limited insight. Tr. at 591.

On March 15, 2010, Plaintiff acknowledged that she was living with a man who is verbally abusive. She reported anxiety and depression. Tr. at 593. On March 29, 2010, Plaintiff was "obsessing about her children all placed in permanent custody," and reported that she refused to move from the apartment she shares with her boyfriend because she would be far from everything. Tr. at 596.  Her  mood/affect was described as angry, very agitated, and labile. Tr. at 597. It was noted that she "bursts out crying" when discussing her children.  She was described as "loud and angry," and was demonstrating repetitive speech and poor insight and judgment.

On April 5, 2010, Plaintiff was described as aggressive and "yelling," and had poor insight. Tr. at 425. On April 8, 2010, Plaintiff stated that she wanted her children back and she was described as angry, anxious, aggressive, and inappropriate. Tr. at 423. She was hitting an elevator and was noted to have poor insight. On April 21, 2010, Plaintiff's mood was described as  calm and pleasant and the treatment notes reflect that she was taking her medication as prescribed. Tr. at 414. Treatment notes dated April 29, 2010 describe Plaintiff as pleasant with her thought process in tact, despite reporting a physical confrontation with her boyfriend. Tr. at 411.

On September 10, 2010, Plaintiff was well groomed and cooperative with average eye contact, clear speech, full mood and affect, no hallucinations, logical thought processes, no suicidal or homicidal ideation, and no impairment of memory or attention and concentration . Tr. at 678-679.

On September 20, 2010, while receiving her Haldol injection, Plaintiff stated ". . . I have to get my act together. I need to find a job, or go back to school. I [have] been denied three times" Tr. at 681.

On April 25, 2011, Plaintiff participated in individual counseling, demonstrated cooperative behavior, average eye contact, clear speech, full affect, no hallucinations, no impairment of memory or attention and concentration, and average intelligence estimate, and was "stable at this time." Tr. at 717-18. On June 20, 2011 and July 25, 2011, Plaintiff denied alcohol use since her last visit and stated: "I feel good, I['ve] been doing good. I ain't had nothing to drink. I['ve] been going to the doctor and he been giving me injections for my pain. That has made a difference" Tr. at 699. Plaintiff further reported "I don't feel as depressed, I['ve] been taking my meds." Tr. at 699, 708. On August 22, 2011, Plaintiff reported that she had unilaterally discontinued one of her medications but continued to do well. Tr. at 690.

Plaintiff received a Haldol injection on October 31, 2011 and reported no increase in symptoms and a "good" mood. Tr. at 871. In November of 2011, Plaintiff stopped taking some of her medications although she was instructed to take all of her medications until advised otherwise. Tr. at 867, 869. On January 17, 2012, Plaintiff received her Haldol injection and again reported that she stopped taking her medications. Tr. at 851. Treatment notes described Plaintiff as demonstrating cooperative behavior, good eye contact, clear speech, anxious mood, near full range affect, logical thought processes, and unremarkable thought content. Tr. at 844-845. The diagnoses on this date were PTSD, bipolar I disorder (most recent episode depressed, moderate), alcohol abuse, and cannabis abuse. Tr. at 846. A GAF score of sixty was assigned.

With respect to her physical impairments, Plaintiff intermittently presented to Mercy and other providers reporting back or fibromyalgia-type pain or urinary incontinence throughout the relevant time period. Tr. at 306, 311-314, 327, 392, 394-401, 502-17, 619-31, 672-76, 733-87, 881-96, 902-05. For instance, after going fishing, Plaintiff presented to Mercy on May 19, 2008 due to back pain with radiation down her leg and fibromyalgia flare-up. Tr. at 392. She "ambulated to the restroom without any difficulty[,]" "had a steady gait[,]" had neurovascularly intact bilateral upper and lower extremities, and had strong pulses throughout." Tr. at 392.

Plaintiff began physical therapy on June 23, 2009 for lower back pain. Tr. at 311. She presented to Mercy on July 16, 2009 due to sacroiliac region pain but reported her lumbar spine was "doing well" with physical therapy. Tr. at 327. On July 23, 2009, Plaintiff reported to her physical therapist that: (1) "she has been doing better"; (2) "her coccygeal pain is no longer constant" that it "comes and gos"; (3) "she [was] painfree in the coccyx today"; and (4) she was "no longer experiencing [lumbar spine] pain." Tr. at 306. Plaintiff was discharged from therapy on July 30, 2009 and reported she was "vastly improved" with "only occasional pain and throb[bing with] sacral pressure" and was "functionally able to perform all duties." Tr. at 311-314.  On November 7, 2009, Plaintiff went to Mercy reporting pain, which led to an impression of acute exacerbation of migraine and fibromyalgia. Tr. at 518.

On November 7, 2009, Plaintiff walked to and from Mercy for treatment of a bronchial infection. Tr. at 517. On December 8, 2009,  Plaintiff presented to the Mercy complaining of abnormal urination. Tr. at 511. George Janas, M.D., diagnosed dysuria (abnormal urination), and a probable urethral introital fistula. Tr. at 512. On December 29, 2009, after Plaintiff experienced dizziness and called the Canton City Fire Department, Patrick S. Crane, M.D., found normal psychiatric, musculoskeletal, and neurologic results. Tr. at 502.  Plaintiff was treated with a normal saline IV to hydrate her after she explained that she was vomiting and suffering from diarrhea.  Tr. at 503.

On May 5, 2010, Plaintiff attended a follow-up appointment at Mercy, where it was noted that her vomiting and diarrhea had subsided. Tr. at 619. A physical therapist evaluated Plaintiff on September 13, 2010 due to leg and hip pain. Tr. at 667. Plaintiff was discharged from therapy on October 5, 2011 after multiple no-shows and cancellations. Tr. at 672-76, 779-787. On December 29, 2010, Plaintiff started therapy for bilateral hip and neck pain. Tr. at 772-76. Plaintiff participated in therapy twice in January of 2011, canceled two additional appointments, and "cont[inued] to be painfree and motivated to improve her symptoms" as of February 8, 2011 . Tr. at 760-771. On February 10, 2011, she rated her pain as "0/10." Tr. at 756-757. After another canceled appointment, Plaintiff was a "no show" on February 24, 2011 and was discharged from therapy. Tr. at 750-757.

-10-

In May of 2011, Plaintiff "dribble[d] urine continuously and ha[d] to use up to [three] pads every day [] to contain urine loss." Tr. at 746. She underwent a cystoscopy, which revealed no fistula Tr. at 744-45.

On May 31, 2011, Mark J. Pellegrino, M.D., a pain specialist at Ohio Pain and Rehab Specialists, evaluated Plaintiff due to increased fibromyalgia pain, fatigue, and bladder incontinence. She reported a pain level of eight out of ten  in her low back and legs, and reported fatigue, and difficulty sleeping.  Dr. Pellegrino diagnosed fibromyalgia syndrome. Tr. at 736. Dr. Pellegrino performed a urine drug screen, found inconsistent results, and counseled Plaintiff accordingly. Tr. at 736. He recognized that lumbrosacral spine x-ray and electrodiagnostic testing produced negative results. Dr. Pellegrino prescribed Gabapentin and scheduled a follow-up appointment to adminsiter trigger point injections.

On June 10, 2011, Plaintiff underwent a second physiatric examination and received four trigger point injections. Plaintiff reported a pain level of eight out of ten, despite also reporting that the Gabapentin was "helping considerably."  Tr. at 735. Dr. Pellegrino recommended that Plaintiff continue Gabapentin and he prescribed Nexium to counteract Plaintiff's heartburn, thought to be a side effect of Gabapentin.  Tr. at 735.

On July 22, 2011, Plaintiff underwent a third physiatric examination at Ohio Pain and Rehab Specialists. Tr.  at 733. She reported a pain level of seven out of ten in the scapular and lumbar areas, and also in the left neck. She indicated previous trigger point injections had initially lessened her pain by fifty percent, but that their effect was limited in time. On physical examination, Dr. Pellegrino noted pain with palpation in the left area of the neck, and in several other areas. The provider diagnosed fibromyalgia syndrome with increased myofascial pain in the scapular and lumbar areas and left cervical region. Plaintiff was to have trigger point injections, and her prescription for Tramadol was refilled. Tr. at 734.

On October 25, 2011, Plaintiff had back pain, some spasm, and radicular pain and no incontinence or retention. Tr. at 896. The treating doctor found good range of motion of extremities, diffuse paraspinal musculature tenderness, motor strength of five out of five, and noted a steady gait. Tr. at 896. On December 12, 2011, Dr. Pellegrino determined Plaintiff was experiencing a

-11-

fibromyalgia flare-up, gave her trigger point injections, and recommended additional physical therapy. Tr. at 902-905.

On December 12, 2011, Plaintiff visited Ohio Pain and Rehab Specialists reporting a flare-up of her chronic pain. Tr. at 902. On physical examination the provider noted that Plaintiff appeared to be in moderate distress. Tr. at 904. He also noted tenderness to palpation in the paraspinals of the whole spine. Tr. at 904. She had eleven of eighteen fibromyalgia tender points. She was diagnosed with fibromyalgia syndrome and muscle spasm. Tr. at 905. Dr. Pellegrino recommended another round of trigger point injections and physical therapy.

Plaintiff sought treatment for her urinary incontinence at Summa Physicians, Inc., between December 27, 2011 and February 1, 2012. Tr. at 907-24. She reported that she had to wear pads and change them three to four times per day. Tr. at 909. She reported voiding urine every half an hour during the day, and several times at night. She indicated that she didn't like to go places because she had to be aware of the location of the bathrooms. Tr. at 910.  On physical examination, Plaintiff's bladder was tender to palpation.

On January 2, 2012, Plaintiff had low back pain that "hurt[] when she bends" but reported "lift[ing] a lot of laundry and mov[ing] things here and there." Tr. at 892. John B. Devine, M.D., a urogynecologist, evaluated Plaintiff on January 19, 2012 due to incontinence and urgency issues. Tr. at 908-924. Plaintiff reported incontinence with loose stools but "denie[d] soiling of her undergarments." Tr. at 910. Dr. Devine found bladder tender to palpation, hypermobility of urethra, and initial urinalysis within normal limits and scheduled Plaintiff to undergo cystourethroscopy. Tr. at 911. On January 20, 2012 and January 21, 2012, Plaintiff reported no urinary symptoms. Tr. at 881-891.

### B.        Agency and Consulting Physicians

On August 3, 2010,  Lisa Schroeder, M.D., performed a physical examination on behalf of the Bureau of Disability Determination. Tr. at 642. Plaintiff's chief complaints were fibromyalgia, degenerative disc disease, and sciatic nerve issues. On physical exam Dr. Schroeder noted limited range of motion in Plaintiff's right ankle, and slightly decreased strength in her right leg. Tr.at 643. Plaintiff had six of eighteen fibromyalgia tender points. Mild paraspinal muscle spasm was also

noted. Tr. at 649. However, x-rays of the cervical spine were normal. Tr. at 645. Dr. Schroeder's assessments were fibromyalgia, degenerative disc disease, and sciatic pain. Tr. at 643. Dr. Schroeder opined Plaintiff would have difficulty working on uneven surfaces, going up or down ladders or steps, or frequently bending or lifting. Tr. at 644. She opined that Plaintiff could lift fifteen to twenty pounds at a time, could walk for a whole work day, sit for a whole work day, and stand for three to four hours of a work day.

On June 9, 2010, Todd Finnerty, Psy.D., concluded Plaintiff had moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, that there was insufficient evidence to make a determination regarding episodes of decompensation, and that the evidence did not establish the "C" criteria. Dr. Finnerty limited Plaintiff to simple routine tasks at a low stress job that did not require a lot of contact with others.  Tr. at 602-615.  Kristen Haskins, Psy.D., affirmed this assessment. Tr. at 684.

On August 27, 2010, Michael Stock, M.D., indicated Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six-hours in an eight-hour workday, sit about six hours in an eight-hour workday, and occasionally climb ramps, stairs, ladders, ropes, or scaffolds. Tr. at  651-658. In October 2010, Diane Manos, M.D., and Rebecca R. Neiger, M.D., affirmed Dr. Stock's assessments. Tr. at 685-687.

Steven Rodgers, M.D., evaluated Plaintiff on November 8, 2011. Tr. at  813-826. Dr. Rodgers noted Plaintiff "appeared to be in no apparent distress" and "had no significant difficulty maneuvering in the room, including moving from a sitting to standing position, or getting on or off the examination table." Tr. at 815. Dr. Rodgers found "no motor or sensory deficits, negative bilateral straight leg raises, no muscle atrophy, full range of motion of the bilateral upper and lower extremities except right ankle, tenderness of the bilateral shoulders, hips, ankles, and thoracic and lumbar spine, and normal range of motion of the cervical spine. Tr. at 815. Dr. Rodgers indicated Plaintiff could continuously lift and/or carry ten pounds, frequently lift and/or carry up to twenty pounds, occasionally lift and/or carry twenty-one to fifty pounds, sit for eight hours, stand for four hours, and walk for two hours in an eight-hour workday, occasionally climb and crawl, frequently

-13-

stoop, kneel, and crouch, and continuously balance. Tr. at 817-19. Dr. Rodgers noted Plaintiff could shop, travel independently, ambulated without an assistive device, walk a block on rough or uneven surfaces, use public transportation, prepare a simple meal, feed herself, care for personal hygiene, and sort, handle, use paper/files. Tr. at 821.

James M. Lyall, Ph.D., evaluated Plaintiff on November 1, 2011 and reported she "presented a generally neat and clean appearance." Tr. at 808. Plaintiff was oriented times four, could remember three of three objects immediately and one of three objects after five minutes, repeated four numbers forward and three numbers backward, and had intact abstract reasoning. Tr. at 808. Dr. Lyall administered the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV"), which yielded the following results: Verbal Comprehension Index of 74; Perceptual Reasoning Index of 79; Working Memory Index of 69; Processing Speed Index of 76; and Full Scale score of 70. Tr. at 811. Dr. Lyall noted: (1) Plaintiff's mood disturbance "may worsen and she may engage in some acting out behavior" under increased work pressure; (2) "she would have difficulty in anymore than simple work environments"; and (3) "[s]he was cooperative but distant with this examiner." Tr. at 809-10.

Dr. Lyall diagnosed Plaintiff with "[b]orderline [i]ntellectual [f]unctioning within the [l]ower [e]nd of the [r]ange" and reported she had moderate restriction in her ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, supervisors, and co-workers, and respond appropriately to usual work situations and to changes in a routine work setting. Tr. at 803-04, 809.

### C. Hearing testimony

Plaintiff, who was thirty-five years of age at the hearing, and thirty-one years of age on her alleged onset date, testified that she is married, but separated from her husband, who has been deported. Tr. at 35-36. She has four children but does not have custody of them. Plaintiff testified that she does not have a driver's license because she cannot pass the written portion of the test. She was assigned to special education classes in high school, but attended some college courses. Tr. at 36.

When asked at the hearing to assess the maximum distance she could walk, Plaintiff responded that she cannot carry a pizza box for two blocks because her arms shake and she drops things.  Tr. at 40.  She testified that she cannot lift or bend due to back pain and fibromyalgia.  Tr. at 40-41.  She experiences neck pain and described her neck "pop[ping]."  Tr. at 41.

Plaintiff was diagnosed with fibromyalgia in 2004 for which she undergoes trigger point injection treatment. She testified that her current physician has indicated his intention to refer her to a back specialist.  She suffers from migraine headaches three or four times per month, which are from twenty to forty-five minutes in duration.  Plaintiff further testified that she has suffered from incontinence of the bowel and bladder for two years, although roughly one month before the hearing she was prescribed medication that has stopped her bowel incontinence and limited her urinary incontinence to two incidents per week.  Tr. at 41.

Although Plaintiff has a history of alcohol and drug abuse, she testified at the hearing that she had not consumed alcohol for one year and had last abused marijuana six or seven months before the hearing.  Tr. at 45.  Plaintiff testified that she always struggled with depression, even prior to her fibromyalgia diagnosis. Tr. at 46.  Plaintiff further testified that she has suffered from PTSD after being choked in 1999, when she was six months pregnant.  Tr. at 47.

Plaintiff sees the shadow of a tall man and feels like she is being choked.  During the night, Plaintiff hears someone calling her name, which she interprets as a message that she will be the "next to die."  Tr. at 50-51.  Plaintiff has attempted suicide in the past, most recently after she had an argument with the person with whom she was residing, and, as a result, she became homeless. Tr. at 47.

When asked at the hearing how she spends her time, she responded that she spends her days at doctors' offices.  Tr. at 48.  She attends physical therapy two time per week. She resides in an abandoned house and eats her meals at various area churches that serves hot meals to indigent people.  She showers at a friend's house.

Plaintiff testified that she can stand for two hours, but must shift her weight from hip to hip; she can walk for a half of one hour; she can sit for one or two hours; but she cannot lift twenty

-15-

pounds. Tr. at 49.  She further testified that she is able to read but has difficulty with pronunciation..
Tr. at 54.

### D.  The ALJ's decision

With respect to Plaintiff's physical impairments, the ALJ gave significant (but not great)
weight to the opinions of Dr. Schroeder and Dr. Rogers.  The ALJ did not give great weight to the
opinions because he believed that they were based upon Plaintiff's subjective complaints, rather than
objective medical evidence.  However, insofar as the opinions of Dr. Schroeder and Dr. Rogers were
supported by the medical evidence in the record and generally consistent with the overall weight of
the evidence, the ALJ accorded them significant weight.  With respect to Plaintiff's mental
impairments, the ALJ gave moderate weight to Dr. Lyall's opinion. The ALJ found that Dr. Lyall's
opinion was generally supported by his examination notes and consistent with the overall weight of
the evidence.

The ALJ observed that he fully accounted for Plaintiff's complaints regarding pain by
limiting her to work at no more than the light exertional level with the occasional performance of
certain postural activities.  Tr. at 19.  Likewise, the ALJ observed that he considered Plaintiff's
incontinence by allowing her immediate access to restroom facilities.  Finally, the ALJ addressed
Plaintiff's mental limitations when he limited her to simple and repetitive tasks in a low stress
environment with no more than occasional and superficial contact with others.

### E.  Listing 12.05

In her first argument, Plaintiff contends that she meets Listing 12.05C.  To meet Listing
12.05C, Plaintiff must demonstrate:  (1) significantly sub-average general intellectual functioning
with deficits in adaptive functioning manifested before the age of twent-two; (2) a valid verbal,
performance, or full-scale I.Q. of 60 through 70; and (3) a physical or other mental impairment
imposing an additional and significant work-related limitation of functioning. 20 C.F.R. pt. 404,
subpt. P, app. 1, § 12.00(A). Any claimant seeking to establish that she is disabled under Listing
12.05C must satisfy the capsule definition of §12.05, along with the other two criteria set forth in
paragraph C. Soc. Sec. Acquiescence Rul. 03-1(7), 68 Fed. Reg. 74, 279, 74, 280 (Dec. 23, 2003).

See also *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir.2001) (recognizing claimant must demonstrate deficits in adaptive functioning to satisfy the listing).

Contrary to Plaintiff's argument, the ALJ adequately determined Plaintiff did not meet 12.05C because the evidence did not establish deficits in adaptive functioning prior to the age of twenty-two, nor did it show that Plaintiff has been diagnosed with mental retardation.[5] Tr. at 14-15, 35, 37-39, 48, 54, 56, 175-204, 209, 234, 239-44, 254-55, 281-96, 547-601, 643, 667, 677-83, 688-730, 806, 808, 842-78. The validity of a claimant's IQ test scores is largely irrelevant if an ALJ determines that, even considering such scores, the claimant does not meet the diagnostic description set forth in the introductory paragraph of Listing § 12.05. See *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 721-22 (6th Cir. 2012) ("[T]he mere fact of a qualifying IQ score does not require that the ALJ find mental retardation under Section 12.05B when substantial evidence supports the contrary conclusion or the claimant's allegations of her capabilities are deemed not credible.") (citation omitted)); *Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007) ("Yet, it is not enough for a claimant to point to one IQ score below 71; the claimant must also satisfy the 'diagnostic description' of mental retardation in Listing 12.05. It is undisputed that no psychologist has diagnosed Cooper with mental retardation. The examiner and clinical psychologist who tested him diagnosed him instead as borderline intellectual functioning.") (internal citations omitted)).

As the ALJ explained in this case, "although the record contains evidence of a full-scale IQ score of 70 assessed while [Plaintiff] was thirty-five, the evidence does not support finding that the impairment onset dated prior to age [twenty-two]." Tr. at 15. In particular, Plaintiff did not demonstrate any "deficits in adaptive functioning"[6] before the age of twenty-two according to her

---

[5]Effective September 9, 2013, the SSA changed the terminology in Listing 12.05 from "Mental Retardation" to "Intellectual Disability." 78 Fed. Reg. 5755-01. This change became effective after the ALJ's decision issued April 25, 2012.

[6]Deficits in adaptive functioning refer to "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [] grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. pt. 404. supt. P, app. 1, § 12.00(C)(1).

Courts have found plaintiffs did not demonstrate deficits in adaptive functioning where, for example:

-17-

reported activities of daily living, including her education and work history, Tr. at 15, 35-36, 48, 54, 175-204, 209-10, 222, 234, 239-45, 254-55, 549, 643, 667, 806, 808. Plaintiff testified that she was in special education classes while in school but also reported obtaining a GED (albeit after two unsuccessful attempts), passing a written driver's test, and attending college classes. Tr. at 15, 36, 54, 175-204.  She maintained relationships with boyfriends and friends, independently used public transportation and shopped, participated in support groups, interacted with case managers for public assistance, and interacted with doctors and their staff. Tr. at 37-39, 48, 234, 239-44, 254-55, 402-66, 643, 808. Plaintiff lived independently, attended school, performed household chores, cared for her personal grooming and hygiene, did laundry, cared for children, fished, rode a bicycle, worked full-time, and drove a motor vehicle. Tr. at 37-39, 48, 56, 175-204, 239-44, 551, 643, 667, 808.

Of equal import, Plaintiff has not been diagnosed with borderline intellectual functioning or mental retardation by her treating psychiatrists. Tr. at 402-66, 547-601, 677-83, 688-740, 842-878. She was diagnosed with borderline intellectual functioning following a one-time consultative examination with state agency consultative examiner, Dr. Lyall. Tr. at 809. Because Plaintiff cannot show that she manifested deficits in adaptive functioning prior to the age of twenty-two, or that she was diagnosed with mental retardation, the undersigned recommends that the Court find that the ALJ's finding that her borderline intellectual functioning did not meet or medically equal 12.05 is supported by substantial evidence.

### F.    Listings 12.04 and 12.06

In her third argument, Plaintiff contends that the ALJ erred in concluding that she is only moderately limited in her social functioning, and, therefore, provided an incomplete analysis with respect to Listings 12.04 and 12.06. In order to meet Listings 12.04 and/or 12.06, Plaintiff must show that she had a mental impairment meeting the requirements of both the "A" and "B" criteria;

---

(1) plaintiff had a history of performing gainful activity involving semi-skilled work, lived independently, could cook, shop, and do laundry, lived independently, and had a diagnosis of borderline intellectual functioning but no opinion that she met or equaled Listing 12.05, *Watson v. Barnhart*, 2006 WL 2945228, at *1 (E.D. Pa. Oct. 13, 2006); (2) plaintiff graduated from high school while taking special education coursework, could drive, communicate, do self-care and instrumental activities of daily living, and had regular contact with family members, *Bouton v. Astrue*, 2008 WL 627469, at *8 (D. Kan. Mar. 4, 2008).

or that she met the requirements of the "C" criteria. See 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04, 12.06. The paragraph "B" criteria for the pertinent listings require, in the absence of repeated episodes of decompensation of extend duration, "marked" limitations in functioning in at least two of the following areas: (1) activities of daily living, (2) social functioning; and (3) concentration, persistence, or pace. See 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04, 12.06. Here, the ALJ specifically considered these criteria in his decision (Tr. 13-15).

The evidence in the record establishes that Plaintiff had a relationship with her boyfriend and was able to understand and interact with health care professionals, examiners, and the ALJ at the hearing. Tr. at 14, 35-54, 281-96, 547-601, 641-49, 677-83, 688-730, 802-26, 842-78. She also maintained relationships with friends, independently used public transportation and shopped, participated in support groups, interacted with case managers, and interacted with doctors and their staff. Tr. at 37-39, 48, 234, 239-44, 254-55, 402-66, 643, 808). Likewise, both state agency psychologists, Drs. Finnerty and Haskins, assigned Plaintiff moderate limitations in maintaining social functioning. Tr. at 612-13, 684, 802-12. Although Dr. Lyall described Plaintiff as "quiet and withdrawn" and indicated she may engage in "some acting out behavior" with increased "pressures[,]" Dr. Lyall also assigned Plaintiff moderate limitations in her ability to interact appropriately with the public, supervisors, and co-workers. Tr. at 803-04. Moreover, no physician opined that Plaintiff met any listing. See 20 C.F.R. §§ 404.1527, 416.927. Accordingly, the undersigned recommends that the Court find that the ALJ's decision with respect to Plaintiff's moderate limitation in social functioning is supported by substantial evidence.

### G.    Substantial evidence

In her second argument, Plaintiff contends that the ALJ erred when he did not credit her testimony regarding her debilitating pain, when he gave significant weight the opinions of the consultative examiners that were at odds with the RFC, and when he failed to include greater physical limitations based upon Plaintiff's urinary incontinence in the RFC.

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the

relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. *See* SSR 96-7p, 61 Fed. Reg. 34483, 34484-34485 (1990).  These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039-40.

Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination. *See Casey*, 987 F.2d at 1234.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

The ALJ explicitly recognized that Plaintiff's "fibromyalgia pain is ongoing. . . [, and] she is treating appropriately and managing through flare ups[,]" based on her improvement with pain management and physical therapy. Tr. 17, 297-401, 659-676, 731-796, 879-900. The ALJ further noted the minimal positive clinical and objective findings regarding Plaintiff's back pain, and the routine and conservative treatment she received for such pain . Tr. at 17, 297-401, 659-676, 731-796, 879-900. In terms of Plaintiff's urinary incontinence, the ALJ noted her lack of "medical work up" and improvement with treatment. Tr. at 17, 744-46, 901-24.  Therefore, the ALJ applied the correct standards in evaluating Plaintiff's credibility regarding her pain and urinary incontinence, and substantial evidence supports his finding that Plaintiff's statements about the intensity, persistence, and limiting effects of these symptoms were not fully credible.

An ALJ is not required to accept a plaintiff's own testimony regarding her pain. *See Gooch v. Secretary of Health and Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  Accordingly, the undersigned recommends that the Court find that the ALJ did not err in discrediting Plaintiff's opinion regarding her pain, and, as a consequence, that Plaintiff's second argument predicated upon the ALJ's credibility assessment has no merit.

Next, Plaintiff contends that the ALJ improperly gave Drs. Rodgers' and Schroeder's opinions "significant weight" because such opinions are not identical to the ALJ's RFC. Contrary

-20-

to Plaintiff's argument, although the ALJ considered the findings and conclusions of Drs. Rodgers and Schroeder, he did not and was not required to adopt their opinions wholesale and include every restriction.  See, e.g., *Lambert-Newsome v. Astrue,* No. 11-1141-CJP, 2012 WL 2922717, at *6 (S.D. Ill. July 17, 2012) (noting fact ALJ gave great weight to opinion "does not mean he was required to adopt it wholesale"); *Irvin v. Astrue*, No. 11-23-AJW, 2012 WL 870845, at *2-3 (C.D. Cal. March 14, 2012) (finding although ALJ gave great weight to medical source opinion he did not err in implicitly rejecting one limitation from opinion). The ALJ specifically noted that the doctors' assessed limitations relied too heavily on Plaintiff's subjective complaints, which as previously noted, the ALJ did not fully credit.

Finally, Plaintiff contends that the ALJ erred in failing to consider the limitations created by her urinary incontinence.  To the contrary, the ALJ considered Plaintiff's complaints of urinary incontinence , however, he found that Plaintiff's urinary incontinence was radically reduced with medication prescribed by Dr. Devine . Tr. at 17-18, 297-401, 659-676, 731-796, 879-900, 901-24. As a matter of a fact, at the hearing, Plaintiff testified that she has suffered from incontinence of the bowel and bladder for two years, but roughly one month before the hearing she was prescribed medication that has stopped her bowel incontinence and limited her urinary incontinence to two incidents per week.  Tr. at 41. As a consequence, the undersigned recommends that the Court find that substantial evidence supports the RFC.

## VI.   CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

DATE: July 29, 2014

                                  */s/George J. Limbert*
                                GEORGE J. LIMBERT
                                UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).